UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED MEDICAL HEALTHCARE, INC. | * | CIVIL ACTION NO. 10-4158 |
| Plaintiff | * | |
| | * | |
| | * | SECTION: H |
| | * | JUDGE JANE TRICHE MILAZZO |
| VERSUS | * | |
| | * | |
| | * | MAGISTRATE: 3 |
| DEPARTMENT OF HEALTH AND | * | MAG. DANIEL KNOWLES, III |
| HUMAN SERVICES | * | |
| Defendant | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

<u>RULING ON MOTION FOR SUMMARY JUDGMENT</u>

The matter before the Court is a Motion for Summary Judgment filed by Plaintiff, United Medical Healthcare, Inc. ("United") (Doc. 20) and a Cross-Motion for Summary Judgment filed by Defendant, Kathleen Sebelius, Secretary of the Department of Health and Human Services ("HHS") (Doc. 25).

For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Cross-Motion is GRANTED.

**BACKGROUND**

United operates an inpatient rehabilitation facility ("IRF"), located in Hammond, Louisiana, and participates in the Medicare program pursuant to 42 U.S.C. §1395c and 42 U.S.C. §1395d. United bills Medicare for IRF services provided to Medicare beneficiaries by submitting claims for the services to its Medicare Fiscal Intermediary, Trispan Health Services ("Trispan"), which then processes the claim and makes payment on behalf of the Centers for Medicare and Medicaid Services ("CMS").  In order to ensure that Medicare claims are correctly paid, CMS also contracts with certain companies to audit Medicare claims on a pre-payment or post-payment basis, including Program Safeguard Contractors ("PSC").  AdvanceMed Corporation ("AdvanceMed") is the Medicare PSC responsible for auditing claims made by United during the relevant time period.

On October 25, 2006, AdvanceMed began a post-payment audit of United.  At this time AdvanceMed requested from United all medical records and supporting documentation pertinent to thirty previously paid claims for Medicare coverage of inpatient therapy services provided between January 1, 2006 and June 30, 2006.  On September 21, 2007, AdvanceMed informed United that it completed its review of the thirty claims and determined that seven of the claims should be allowed and twenty-three claims should be denied.  AdvanceMed asserted that the documentation received from United did not adequately support coverage for the claims. AdvanceMed's report indicated that, based upon the results of a statistically valid random sample of thirty claims, United had received a Medicare overpayment extrapolated to a total of

$1,103.686.00.  On October 3, 2007 Trispan formally notified United of the overpayment.

United appealed this initial overpayment determination by requesting a Redetermination review by Trispan in accordance with the Medicare Appeal rules ("First Appeal").  United requested individual determinations for each of the thirty beneficiary claims in the sample.  In those requests, United did not question the underlying sample or extrapolation, limiting its challenge to the individual coverage determinations.  On February 14, 2008, Trispan issued its Redetermination decision.   Trispan held that an additional three of the claims should be allowed.  Thus, nineteen of the claims remained denied, and eleven of the thirty original claims were allowed.  Based on the Redetermination decision, the extrapolated overpayment was $869,739.00.

Following the Redetermination decision, United requested a Reconsideration review from Maximus Federal Services, Inc. ("Maximus"), a Medicare Qualified Independent Contractor ("QIC") ("Second Appeal").  On June 16, 2008, the QIC issued its initial beneficiary-specific reconsiderations for the nineteen cases in which United had received unfavorable redeterminations.  The QIC affirmed the determinations and concluded that all nineteen claims should remain denied.  The QIC did not address the sampling or extrapolation issues.

On August 12, 2008, United requested a hearing before a Medicare Office of Hearings and Appeals Administrative Law Judge ("ALJ") ("Third Appeal").  On September 15, 2008, the ALJ issued an order of remand to the QIC because the first Reconsideration did not contain a proper analysis of the statistical sample.  Specifically the ALJ noted that the statistical sampling and extrapolated

-3-

overpayment were "central issues" and "inextricably tied to each of the claims in the sample group." Admin. Rec. 5.

On February 6, 2009 the second QIC reconsideration found no error in the sampling or extrapolation and also determined that none of the nineteen claims could be covered by Medicare. The QIC did, however, make an adjustment to the overpayment amount. This adjustment reduced the overpayment by $1,295.32, thereby reducing the overpayment demand to $868,443.65. The QIC reaffirmed United's liability for the costs of the non-covered services.

On February 11, 2009 United requested a hearing before an ALJ to review the second Reconsideration decision. In that request United acknowledged that the QIC had found the sample and extrapolation valid and sought review of only the remaining nineteen unfavorable coverage determinations. On October 13-14, 2009 the ALJ conducted a hearing at which two representatives for United and an expert for AdvanceMed appeared and testified. Specifically, testifying on United's behalf was Dr. Luis Franco, M.D., Medical Director for United, and Larry Smith, Compliance Officer for United. Testifying for AdvanceMed at the hearing was Marna Bogan, R.N.

On December 14, 2009, the ALJ issued her decision. The ALJ found that the sampling methodology employed by AdvanceMed was valid. The ALJ then reviewed all thirty beneficiary claims in accordance with 42 C.F.R. §405.1064 ("when an appeal from the QIC involves an overpayment issue and the QIC uses a statistical sample in reaching its reconsideration, the ALJ must base his or her decision on a review of the entire statistical sample used by the QIC"). The

ALJ found that an additional five claims should be covered by Medicare, leaving fourteen claims not covered.  The ALJ further determined that United's liability for the non-covered services could not be waived under Section 1879 of the Social Security Act.  Lastly, the ALJ directed the Medicare contractor to re-extrapolate the overpayment consistent with her findings.

Subsequently, United requested a review of the ALJ's decision by the Medicare Appeals Council ("MAC") ("Fourth Appeal").  United asked the MAC to review the fourteen unfavorable coverage determinations remaining at issue.  On August 26, 2010 the MAC issued a decision.  The MAC held that there was no error in the ALJ's decision with respect to the coverage determinations for the individual beneficiaries in the sample.  The MAC did, however, modify the ALJ's decision to reflect the applicable law under Sections 1870 and 1879 of the Social Security Act regarding waiver of recovery and liability for non-covered services.

On October 29, 2010 United filed a Complaint in this Court seeking judicial review of the August 26, 2010 MAC decision ("Fifth Appeal").  (Doc. 1.)  On July 6, 2011 United filed a Motion for Summary Judgment.  (Doc. 20.)  On September 14, 2011 HHS filed an Opposition and Cross-Motion for Summary Judgment.  (Doc. 25.)  On October 6, 2011 United filed a Reply brief.  (Doc. 26.)  On November 7, 2011 HHS filed a Reply brief.  (Doc. 28.)

**LEGAL STANDARDS**

*I. Summary Judgment Standard*

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2012).  In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in her favor. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997).  Summary judgment is appropriate if the non-movant "[f]ails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"The summary judgment procedure is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency." *Girling Healthcare, Inc. v. Shalala*, 85 F.3d 211, 214-215 (5th Cir. 1996) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure: Civil 2d § 2733 (1983)).  The Fifth Circuit has consistently "[u]pheld the use of summary judgment as a mechanism for review of agency decisions." *Id.* at 214.  While the administrative agency acts as the fact finder, the district court determines whether the administrative action is consistent with the law and no more. *Id.*

*II. Standard of Review*

The parties disagree as to what the appropriate standard of review is in this case.  United argues that the Administrative Procedure Act, 5 U.S.C. § 706, provides for the appropriate standard of review.  Under this standard of review, the district court "[s]hall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706 (West 2012).  The district court can overturn the Secretary's findings and conclusions if it finds them to be arbitrary, capricious, and abuse of discretion, not in accordance with the law.  *Id.*

HHS argues that the Secretary's decision should be reviewed under Section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), and not the Administrative Procedure Act. Specifically, HHS notes that this appeal was brought under 42 U.S.C. § 1395ff(b) which provides "[t]hat any individual who is dissatisfied with the Secretary's decision regarding a claim to benefits is entitled to a hearing and to review of the final decision as provided in Section 405(g)." *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000).  Under Section 205(g) the district court has the

> power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of [the Secretary], with or without remanding the cause for a rehearing.  The findings of [the Secretary] as to any fact, if supported by substantial evidence, shall be conclusive. . .

42 U.S.C. § 405(g).

The record reflects that this is an appeal under 42 U.S.C. §1395ff(b).  Admin. Rec. 1.  In

support of its contention that the Administrative Procedure Act provides the appropriate standard of review, United cites to a number of cases where an appeal was brought under 42 U.S.C. §1395oo(f). (Doc. 26, p. 3.) The Court finds these cases to be inapplicable. *See Estate of Morris*, 207 F.3d at 745 (holding that an appeal under 42 U.S.C. § 1395oo(f) is "inapposite" to an appeal under 42 U.S.C. § 1395ff(b)). Thus, the appropriate standard of review is under 42 U.S.C. § 405(g). *See* 42 U.S.C. § 1395ff(b)(a)(A) ("judicial review of the Secretary's final decision . . . is provided in section 405(g) of this title").

When Section 405(g) controls, the Court may not overturn the Secretary's decision if it is supported by substantial evidence and correctly applies the law. *Estate of Morris*, 207 F.3d at 745 (citing *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992)). Substantial evidence is more than a mere scintilla of evidence and must consist of "[s]uch relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Girling Health Care, Inc.* at 215 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1213 (5th Cir.1991) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The substantial evidence standard is less demanding than that of preponderance of the evidence, and the [agency's] decision need not constitute the sole inference that can be drawn from the facts." *New Thoughts Finishing Co. v. Chilton*, 118 F.3d 1028, 1030 (5th Cir.1997)). Courts must "[s]crutinize the

-8-

record to determine whether substantial evidence exists but may not reweigh the evidence, try the issues *de novo*, or substitute [the Court's] judgment for that of the [ALJ]" *Green v. Barnhart*, No. Civ.A. 01-1643, 2002 WL 31780159, at *1 (E.D. La. Dec. 10, 2002) (citing *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)) (internal quotations omitted).   Ultimately, "[i]f supported by substantial evidence, the decision of the Secretary is conclusive and must be affirmed." *Sid Peterson Mem'l Hosp. v. Thompson*, 274 F.3d 301, 311 (5th Cir.2001) (quoting *Richardson,* 402 U.S. at 390).

## LAW AND ANALYSIS

*I. The Statutory Framework*

A) <u>Medicare and Rehabilitation Hospitals</u>

"Medicare is a federally funded health insurance program for the eligible elderly and disabled." *Miss. Care Ctr. of Morton, LLC v. Sebelius*, 449 Fed. Appx. 341, 344 (5th Cir. 2011).  It is codified in Title XVIII of the Social Security Act.  *See* 42 U.S.C. § 1395, *et seq.*  The program consists of four parts.  Medicare Part A provides coverage for inpatient hospital services and institutional care.  *See* 1395c to 1395i-5.  United operates its IRF under Part A of the Medicare program.  (Doc. 1, ¶5.)

Hospitals are typically reimbursed for covered inpatient hospital services under the Medicare Part A Inpatient Prospective Payment System ("PPS").  42 U.S.C. § 1395ww.  Under this

program "Medicare reimburses a fixed amount per patient based on the Diagnosis Related Group ("DRG") into which the patient falls, and further based on the patient's diagnosis and procedures performed."  *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 287 Fed. Appx. 396, 397 (5th Cir. 2008). Hospitals that meet certain requirements are exempted from the PPS and are reimbursed differently.  42 C.F.R. § 412.23 (2011).  It is undisputed that United is a rehabilitation hospital as defined by 42 C.F.R. § 412.23(b).  *See* 42 C.F.R. § 412.29 (2011) (outlining the requirements for exclusion from the PPS for an IRF); *see also* (Doc. 20-16, ¶5.)  Thus, United is excluded from the PPS.  42 C.F.R. § 412.23(b) (2011).  When a hospital is excluded from the PPS they are reimbursed under the cost reimbursement rules set forth in 42 C.F.R. § 413.  42 C.F.R. § 412.22 (2009).

### B) Medicare Coverage for Inpatient Hospital Rehabilitation Services

Generally, Medicare does not allow payment under Medicare part A or part B "[f]or any expenses incurred for items or services . . . [which] are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)).  Under this authority, Medicare may deny payment when a patient requires services that could have been appropriately provided in a less intensive setting. *Medicare Coverage of Inpatient Hosp. Rehab. Servs.*, 50 Fed. Reg. 31040-01 (July 25, 1985).  "With respect to inpatient hospital services . . . which are furnished over a period of time, a physician certifies that such services are required to be given on an inpatient basis for such individual's medical treatment, or that inpatient diagnostic study is medically required and such services are

necessary for such purpose."  42 U.S.C. § 1395f(a)(3).

The criteria for Medicare coverage of inpatient hospital rehabilitation services prior to January 1, 2010 is set forth in Health Care Financing Administration ("HCFA") Ruling 85-2.[1] *Medicare Program; Criteria for Medicare Coverage of Inpatient Hosp. Rehab. Servs.*, 74 Fed. Reg. 54835-01 (Oct. 23, 2009).  HCFA Ruling 85-2 was "[d]esigned to provide coverage criteria for a small subset of providers furnishing intensive and complex therapy services in a fee-for-service environment to a small segment of patients whose rehabilitation needs could only be safely furnished a hospital level of care."  *Id.*

A hospital level of care is required when a patient "[n]eeds a relatively intense rehabilitation program that requires a multi disciplinary coordinated team approach to upgrade his [or her] ability to function."  *Medicare Coverage of Inpatient Hosp. Rehab. Servs.*, 50 Fed. Reg. 31040-01 (July 25, 1985).  Generally,

[t]here are two basic requirements which must be met for inpatient hospital stays for rehabilitation care to be covered:
1. The services must be reasonable and necessary (in terms of efficacy, duration, frequency,

---

[1]

In August 2009, HHS adopted new coverage requirements and technical revisions for IRF requirements "[t]o reflect the changes that have occurred in medical practice during the past 25 years." *Medicare Program; Criteria for Medicare Coverage of Inpatient Hospital Rehabilitation Services*, 74 Fed. Reg. 54835-01 (Oct. 23, 2009). The new IRF coverage requirements became effective for IRF discharges occurring on or after January 1, 2010. *Id.* While HCFA Ruling 85-2 was rescinded as of January 1, 2010, HCFA Ruling 85-2 "[w]ill continue to apply for all IRF discharges that occur prior to January 1, 2010." *Id.* Thus, the Court finds that the criteria as set forth in HCFA Ruling 85-2 is still applicable in this case as the IRF discharges occurred in 2006.

and amount) for the treatment of the patient's condition; and

2. It must be reasonable and necessary to furnish the care on the inpatient hospital basis, rather than in a less intensive facility, such as a [skilled nursing facility][2], or on an outpatient basis.

*Id.*

Prior to admitting a patient to a rehabilitation hospital, a preadmission screening is typically done. *Id.* This screening is a preliminary review of the patient's condition and medical records to determine if the patient could significantly benefit from either an intensive hospital program or extensive inpatient assessment. *Id.* If the preadmission screening indicates that the patient has the potential to benefit from an inpatient hospital program, then a period of inpatient assessment could be covered. *Id.* An inpatient assessment is covered only if it is reasonable and necessary to perform the assessment at the hospital. *Id.*

Ultimately, a patient in need of rehabilitation on an inpatient hospital basis requires all of the following: (1) Close medical supervision by a physician with specialized training or experience in rehabilitation; (2) Twenty-four-hour rehabilitation nursing; (3) A relatively intense level of physical therapy or occupational therapy; (4) A multidisciplinary team approach to the delivery of the program; (5) A coordinated program of care; (6) Significant practical improvement; (7) Realistic

---

[2]

A skilled nursing facility is defined as an institution which is primarily engaged in providing skilled nursing care and related services or rehabilitation services for the rehabilitation of injured, disabled, or sick persons. 42 U.S.C. § 1395i-3. Additionally, a skilled nursing facility must provide specialized caregivers. Specifically, each skilled nursing facility must have a twenty-four hour licensed nursing service and every resident must be supervised under a physician. *Id.*

goals; and (8) Length of rehabilitation program.  *Id.*  In the instant case, the ALJ concluded, and the

MAC confirmed, that the services rendered to the fourteen beneficiaries were not reasonable or

necessary for their treatment or maintenance.

C) <u>Administrative Appeals Process for Medicare Claims</u>

CMS is the designated agency within HHS to administer and oversee the Medicare program.

CMS, in turn, hires contractors to perform administrative functions on its behalf.  In this case,

United had previously billed Medicare for inpatient rehabilitation services provided to multiple

Medicare beneficiaries. Admin. Rec. 117.  Some of the claims were subsequently paid by Medicare.

*Id.*  "If upon later review the Medicare contractor finds that Medicare paid for non-covered

services, it can assess an overpayment and recover the overpaid amount."  *Lynncore Medgroup,*

*Inc. v. Sebelius*, No. 4:11-cv-195, 2011 WL 6116536, at *1 (E.D. Tex. Nov. 10, 2011) (citing 42 C.F.R.

§ 405.371).

A comprehensive administrative appeals process is available to parties that are dissatisfied

with the overpayment determination of a contractor or CMS.  *See* 42 C.F.R. § 405.900, *et seq.*

Subsequent to the contractor or CMS making an initial determination of overpayment, a

beneficiary or provider may ask for a redetermination by that same contractor.  *See* 42 C.F.R. §

405.940, *et seq.*   If the party is still not satisfied then it may request a QIC to perform a

reconsideration of the claim.  *See* 42 C.F.R. § 405.960, *et seq.*   A party who is dissatisfied with

reconsideration decision of the QIC may then request a hearing before an Administrative Law Judge

if the amount in controversy is met.  *See* 42 C.F.R. § 405.1002, *et seq.*  If the party is displeased with

the ALJ decision then it may request review by the MAC.  *See* 42 C.F.R. § 405.1102, *et seq.*  The

decision of the MAC is final and binding on all parties and is considered the final decision of the

Secretary.  42 U.S.C. § 1395ff(b); 42 C.F.R. § 405.1130.  "Any individual, after any final decision of

the [Secretary] made after a hearing to which he was a party . . . may obtain a review of such

decision by a civil action" in the appropriate federal district court.  42 U.S.C. § 405.

*II. Substantial Evidence and the Secretary's Decision*

A) <u>Contentions of the Parties</u>

United argues that the fourteen beneficiaries meet all of the Medicare coverage criteria for

inpatient hospital rehabilitation services and that the Secretary's decision is not supported by

substantial evidence.  They attach two summaries of the medical records - one provided by Dr.

Franco, United's Medical Director, and the other provided by the Compliance Officer for United.

United asserts that these opinions were provided to the ALJ, however both the ALJ and the MAC

ignored them without explanation.  United concludes that the ALJ and the MAC favored Ms.

Bogan's testimony and that there is no substantial evidence to justify their decision.

HHS argues that there is substantial evidence in the administrative record to support the

Secretary's decision that it was not reasonable and necessary to furnish services to the fourteen

disputed beneficiaries on an inpatient basis.  They further note that United has the burden to

establish that the documentation supports that the services were reasonable and necessary, however provides no specific evidence in the record to support its position that the ALJ and the MAC erred in their determinations.  Instead, United only includes a recitation of the services provided and conclusory statements concerning the beneficiary's qualifications for IRF services.

B) Analysis

The MAC decision rendered on August 26, 2010 is the final decision of the Secretary of Health and Human Services.  In that decision the MAC reviewed the ALJ's decision *de novo*.  *See* 42 C.F.R. 405.1108(a); *see also* Admin. Rec. 3.  In its decision, the MAC stated that:

> [b]oth the ALJ's decision and appellant's request for review evidence a thorough consideration of the record for each of the beneficiaries whose claims remain in issue. However, in spite of the appellant's arguments, the Council finds no basis for changing the ALJ's coverage determinations.

Admin. Rec. 8.  In the end, the MAC agreed with the ALJ's assessment of the evidence and affirmed the non-coverage findings for the fourteen beneficiaries.

This Court finds that the ALJ and the MAC, in its affirmation of the ALJ's decision, did have substantial evidence to support unfavorable determinations for the fourteen beneficiaries.  The ALJ was faced with a variety of medical opinions. Present at the hearing were Dr. Luis Franco, M.D., Medical Director for United; Larry Smith, Compliance Officer for United; and Marna Bogan, R.N., Part A Subject Specialist on behalf of AdvanceMed.  Additionally, the ALJ "[r]eviewed the medical documentation for each beneficiary at issue in this case to ascertain whether the services provided

were medically reasonable and necessary." Admin. Rec. 126. Within the medical documentation were the medical records of the patients and the opinions of Dr. Franco, Mr. Hill, President of United, and the opinion of the QIC's physician, Dr. Yarowsky, who reviewed the beneficiaries' cases.

United argues that Dr. Franco was the treating physician of these patients, yet the ALJ based her decision off of the opinions of Marna Bogan and Dr. Yarowsky - neither of which examined the patients. Although the Court recognizes that a treating physician should be given considerable deference, "[a] treating physician's opinion is not dispositive" and will only be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Hosp. Serv. Dist. No. 1 of Parish of Lafourche v. Thompson*, 343 F.Supp.2d 518, 524 (E.D. La. 2004) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). Ultimately, "[t]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). The treating physicians opinions are not conclusive and "may be assigned little or no weight when good cause is shown." *Id.* (quoting *Brown v. Apfel*, 192 F.3d 492 (5th Cir. 1999) and *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994)). Good cause includes instances where the physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or otherwise not substantiated by the record. *Id.*

United's representatives routinely made conclusions that the patients deficits established

a requirement for intense rehabilitation services in an IRF.  This Court notes, however, that while a patient may benefit from IRF services, these statements do not establish that such services are covered under the applicable Medicare coverage criteria.

Ultimately, United is requesting this Court to reweigh the evidence, however, the Court is not permitted to do that as it is "[i]nconsistent with the well-established principle that the Secretary, not the judiciary, is responsible for weighing the evidence, resolving material conflicts, and deciding cases." *Hosp. Serv. Dist. No. 1 of Parish of Lafourche,* 343 F.Supp.2d at 525 (citing *Chaparro v. Bowen,* 815 F.2d 1008, 1011 (5th Cir. 1987)); *Johnson v. Bowen,* 864 F.2d 340, 346-47 (5th Cir. 1988)).  "[T]he very nature of the Medicare program suggests that the Secretary's determinations are entitled to deference from this court." *Almy v. Sebelius*, 679 F.3d 297, 302 (4th Cir. 2012).  "To uphold the agency's interpretation . . . [the court] need only to conclude that it is a reasonable interpretation of the relevant provisions." *Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 389 (1984).

Based on the analysis below, this Court finds that the ALJ made reasonable interpretations of the appropriate provisions, gave the appropriate credence to the medical opinions before her, and had substantial evidence in the record to support her conclusions.

C) <u>The Beneficiaries</u>

       *i. J.B.*

J.B. was a 66 year old woman with a urinary tract infection ("UTI"), arthritis in both shoulders, and was post-operative anemic.  Admin. Rec. 745.  J.B. had just undergone a single knee replacement surgery which was secondary to degenerative joint disease.  Admin. Rec. 564.  J.B. was taking various medications for these ailments in addition to utilizing a continuous passive motion device ("CPM") for her post-operative knee.  Admin. Rec. 746.  She was admitted because there was a concern of decreased mobility and functional independence.  Admin. Rec. 564.

The ALJ, while agreeing that J.B.'s blood pressure medication, oral antibiotics and pain medication were adjusted, ultimately found that "[t]hese services could have been provided in a skilled nursing facility."  Admin. Rec. 127.  The ALJ concluded that the record did "[n]ot demonstrate that the beneficiary required a coordinated, intensive program of multiple services" and that the services could have been provided in a skilled nursing facility.  *Id.*

Dr. Franco asserts that J.B.'s use of the CPM and the regular adjustments of these medications required close medical supervision by a physician with specialized training and experience and rehabilitation and also twenty-four-hour rehabilitative nursing.  Admin. Rec. 746.  He concluded that the level of care that J.B. received necessitated an inpatient hospital stay.  *Id.*  Dr. Yarowsky identified several reasons before reaching the conclusion that J.B.'s services were not medically reasonable and necessary.  Specifically, he noted that 24-hour care was not necessary as there were no complicating or acute orthopedic issues and that her prior chronic conditions had

previously been managed in the outpatient setting.   Admin. Rec. 719-720.   Further, notwithstanding the patient's chronic conditions, there was a general picture of medical stability. Admin. Rec. 720.   Lastly, post-operative deficits from a single joint repair are not inherently complex and therefore do not require complex, coordinated, intensive rehabilitation services.   *Id.*

The hearing testimony indicated that Judge Heard asked if the medications, CPM and UTI could all have been handled at a SNF.  Admin. Rec. 5136, 5139, 5145.  Although disputed, there was testimony that these issues could be treated at a SNF.  Based on the testimony and a review of the medical documents and opinions, the Court finds that the ALJ had substantial evidence upon which to base her decision.

### ii. M.D.

M.D. was an 83 year old woman with a history of cerebral vascular accident ("CVA") and was suffering from diabetes, chronic artery disease and hypertension.   Admin. Rec. 827. Additionally, M.D. had suffered a stroke six years earlier which caused left side paresis.  *Id.*  She was able to gradually regain strength on the left side of her body, but it remained weaker than the right side.  *Id.*  United admitted her due to a recent decline in functioning to provide her with rehabilitation services and to monitor her medical conditions.  *Id.*

The ALJ found that "[t]he record established that the beneficiary required, at most, only minimal assistance with functional tasks; thus, intensive rehabilitation services provided by a hospital were not necessary."  Admin. Rec. 131.

The medical documents highlight that prior to Hurricane Katrina, seven months before her entrance at United, she was able to ambulate with a walker, utilize a power wheelchair and perform most activities without assistance.  Admin. Rec. 827.  At the time she was admitted into United she had lost the ability to get out of bed, was unable to ambulate, and needed assistance with self-care.  *Id.*  Dr. Franco asserts that the medical workups and monitoring required specialized physician care and nursing, that intense therapy was likely to benefit M.D. back to an ambulatory state, and that a multi-disciplinary approach and coordinated program of care was necessary.  Admin. Rec. 1104-1108.  Mr. Smith argued at the hearing that all three elements were met such that M.D.'s services were medically necessary.  Admin. Rec. 5183.  In contradiction, Dr. Yarowsky found that no services at issue were medically reasonable and necessary.  Admin. Rec. 1061-1065.  Ms. Bogan highlighted that the chart showed a gradual, functional decline and while the patient needed some long-term care and therapy, M.D. did not reach an acute level of care such that these services could not have been provided in a less intensive facility.  Admin. Rec. 5191.

While this Court does find the ALJ's analysis lacking, a review of M.D.'s medical records, the opinions of all medical physicians and nurses and the testimony at the hearing indicate to this Court that the ALJ had substantial evidence on which to base her decision.

### iii. A.J.

A.J. was a 63 year old woman diagnosed with end stage renal disease, chronic heart failure,

hypertension and a history of schizophrenia.  Admin. Rec. 1444.  Additionally, A.J. was morbidly obese, had polyarthritis involving her hips and knees, and had a torn meniscus in her right knee causing her immobility.  *Id.*  The torn meniscus was repairable by surgery, however she had not been cleared by a cardiologist.  Admin. Rec. 5230.  After missing hemodialysis treatments and having a three month functional decline she was admitted to United after being referred by her nephrologist.  Admin. Rec. 1451.  She was unable to ambulate at the time she entered United because of her non-weight bearing status due to her torn meniscus.  Admin. Rec. 1447.  The ALJ found that the beneficiary did not require a coordinated, intensive program of multiple services and that the services at issue could have been provided at a lesser intensive facility.  Admin. Rec. 134.

 While at United, A.J. experienced fever, had several episodes of hyperkalemia, was noted as anemic, diagnosed with an upper respiratory infection, treated for vaginitis, and had her blood sugars monitored.  Admin. Rec. 1452.  Dr. Franco stated that a multi-disciplinary approach was applied and she was given a coordinated program.  Admin. Rec. 1453.  He concluded that her treatments at a less intensive level of care would not have been appropriate.  *Id.*  Conversely, Dr. Yarowsky found that the patient "[r]equired restorative rehabilitation but simply did not require further hospital-level care" and "[h]ad no single or combination of medical conditions not treated routinely at lower levels of care."  Admin. Rec. 1426.  He concluded that skilled nursing facilities routinely manage patients medically as complex as this patient while offering a lower intensive

medical and rehabilitation services.  Admin. Rec. 1426-1427.  Ms. Bogan testified that the Medicare guidelines require a polyarthritic and ostearthritic patient may only be admitted to an IRF after there was an aggressive and sustained course of outpatient therapy in a less intensive setting prior to admission.  Admin. Rec. 5225; *see also* 42 C.F.R. 412.29.  This requirement was not met for A.J. *Id.*  It was also noted that A.J. made little progress at United.  Admin. Rec. 5224-5226.

After a review of the record this Court finds substantial evidence for which the ALJ based her decision.

> *iv. B.J.*

B.J. is a 75 year old male that had been diagnosed with diabetes, hypertension, and chronic obstructive pulmonary disorder.  Admin. Rec. 1760.  B.J. was admitted to United from home for deconditioning from progressive pain and lower extremity weakness related to spinal stenosis with lumbar radiculopathy.  Admin. Rec. 1731.  After his admission to United, B.J. was found to have a urinary tract infection and depression for which United monitored his medications.  Admin. Rec. 1761.

The ALJ assessed B.J.'s rehabilitation progress, or lack thereof, and held that "the record did not substantiate a finding that there was a reasonable expectation of significant, practical improvement."  Admin. Rec. 135.  Additionally, she found that the beneficiary did not require a coordinated, intensive program of multiple services.  *Id.*

Dr. Franco highlighted that B.J. had declined within several months to a moderate to total

assistance level, but was previously at a minimal assistance to supervision level.[3]  Admin. Rec. 1762.

Ultimately, Dr. Franco "noted the patient's rehabilitation diagnosis and medical comorbidities,

which were impeding his progress, and . . . knew that significant practical improvement could be

made in an inpatient rehabilitation setting."  *Id.*  Dr. Yarowsky agreed that "[t]he patient had

experienced a decrease in functional ability related to general debility, and did experience in IRF

an improvement in level of functioning."  Admin. Rec. 1732.  On the other hand, Dr. Yarowsky

concluded that the intensity of the services provided were not needed for that improvement.  *Id.*

In the end, the record reflected that Dr. Franco and Mr. Hill determined that B.J. met all eight

factors needed for coverage, while Dr. Yarowsky found that no services were medically reasonable

and necessary.  *See* Admin. Rec. 1760, 1752, 1730.  The record indicates that B.J. achieved none

of his occupational long-term goals and two out of three long-term goals related to speech.  Admin.

Rec. 1757-1758.  In relation to his physical therapy, he achieved three out of four short-term goals

and only met one of his long-term goals.  *Id.*

Significant to both the ALJ and this Court was the indication that there were cognitive and

physical barriers for reasonable improvement.  Ultimately, after reviewing the medical documents

and opinions this Court finds that the ALJ did have substantial evidence to find that there was not

a reasonable expectation of significant, practical improvement and that a coordinated, intensive

---

[3]

Dr. Franco was not B.J.'s physician while he was at United, however wrote the medical opinion on
his behalf.  Admin. Rec. 5247.

program of multiple services was not required.

> *v. M.K.*

M.K. was an 84 year old woman who was admitted to United post rehospitalization for herpes zoster with resultant peripheral neuropathy, postherpetic neuralgia and generalized paresis worse in the left extremity. Admin. Rec. 2093. The record reflects that she had previously been diagnosed with hypothyroidism, pernicious anemia, diabetes and hypertension. Admin. Rec. 2093-2094. United admitted M.K. from an acute care hospital in order to provide rehabilitation services and medical monitoring following a functional decline. Admin. Rec. 2087; 5257.

The ALJ found that the services were not medically reasonable and necessary because the record did not demonstrate that the beneficiary required the 24 hour availability of a physician or a coordinated intensive program of multiple services. Admin. Rec. 135. The ALJ held that her pain and medications could have been managed in a SNF and that the general services should have been provided in a less intensive facility. *Id.*

Dr. Franco asserted that the "[p]atient clearly required close medical supervision for monitoring and treatment of her active herpes zoster, [and] monitoring and treatment of her significant pain complaints." Admin. Rec. 2094. Mr. Hill reiterated Dr. Franco's analysis and concluded that "[t]his level of on-going oversight is not seen outside of a hospital level of care." Admin. Rec. 2087. Mr. Smith stated that the Demerol would have precluded a SNF from accepting M.K. Admin. Rec. 5258. Ms. Bogan, on the other hand, asserted that SNFs can handle contact

isolation and the Demerol IV medication if needed.  Admin. Rec. 5265.  Ms. Bogan clarified that there is a difference between a nursing home and a skilled nursing facility in which a staff must be available to handle IV medications.  Admin. Rec. 5266.  Dr. Yarowsky noted that "[t]he chart [did] not indicate a foreseeable need for frequent physician assessment or intervention or for 24-hour specialty nursing availability to maintain medical stability while participating in rehabilitation."  Admin. Rec.2069.  Lastly, Dr. Yarowsky asserted that "[a]ll medical issues noted in the chart routinely are managed at lower levels of care."  Admin. Rec. 2070.  The Medicare program requires that a patient in an IRF require close medical supervision by a physician with specialized training or experience in the field of rehabilitation.  *Medicare Coverage of Inpatient Hosp Rehab. Servs.*, 50 Fed. Reg. 31040-01 (July 25, 1985).  A SNF is appropriate if a patient's care requires the general supervision of a physician as opposed to close supervision, which hospital patients need.  *Id.*  Based on a reasonable interpretation of this criteria, this Court finds that the ALJ did have substantial evidence upon which to base her decision.

### vi. H.L.

H.L. was a 72 year old male that was admitted to United after having a significant functional decline.  Admin. Rec. 2518.  The medical records indicate that prior to being admitted H.L. had suffered increasing weakness over the past three to five years.  Admin. Rec. 2171.  Four years prior he had suffered a stroke which caused residual paresis on the right side of his body.  *Id.*  The patient had not been ambulatory for over three years.  *Id.*  Additionally, the patient had mild

dementia, polyarthritis involving his knee, hips, and hands, hypertension, coronary artery disease and likely had Parkinson's disease.  *Id.*  During his stay it was determined he had a right hip prosthesis, which was dislocated severely with multiple bony fragments.  Admin. Rec. 2528.

The ALJ found this medical history significant and determined that the services provided were not medically reasonable and necessary as there was not a reasonable expectation of significant, practical improvement.  Admin. Rec. 136.  Additionally, the ALJ found that the record did not demonstrate that the beneficiary required a coordinated, intensive program of multiple services.  *Id.*

Dr. Franco acknowledged all of H.L.'s ailments, and stated that "[s]ignificant practical improvement was expected, as we had initially hoped that the patient could return home with his family."  Admin. Rec. 2528.  Additionally, he noted that three hours of therapy was needed daily and a multidisciplinary team approach was necessary.  *Id.*  Conversely, Dr. Yarowsky concluded that "[t]he mismatch between the chronicity of the patient's underlying deficits and the intensity of the services being offered was underlined by the patient's inability to make much significant practical progress."  Admin. Rec. 2499.  Dr. Yarowsky noted that "[g]eneral debility, such as for general medical conditions, as with this patient's chronic general weakness and debility, does not require complex hospital-level rehabilitation services as much as strengthening and remobilization."  *Id.*  He further noted that while "[i]npatient rehabilitation is the standard of care following major stroke," this is only the case in the acute phase.  *Id.* Mr. Smith did point out, however, that there

is no requirement that every admission to an IRF has to be based on an acute condition immediately prior to the decision to admit.  Admin. Rec. 5271.  Ultimately, the record reflects that H.L. achieved minimum progress and was transferred to a SNF.  Admin. Rec. 5277.

A review of the medical documents and the medical opinions reveals that the ALJ did have substantial evidence upon which to base her conclusions.

*vii. D.M.*

D.M. was a 44 year old male who had severe destructive rheumatoid arthritis with significant pain.  Admin. Rec. 2601.  As a result he had severe contractures in the knees, hips, and ankles as well as severe finger disfigurations.  *Id.*  He was also noted to have decubitus heel ulcers and sacral decubitus ulcer.  *Id.*  Immediately prior to his admittance to United, D.M. was at an acute hospital. Admin. Rec. 2889.  He was referred to United in order to get more intensive rehabilitation. *Id.*  At the time that he was admitted he was not ambulatory, reported falls due to lower extremity weakness, required assistance for most Activities of Daily Living ("ADL") and was independent with eating (presumably after set up).  Admin. Rec. 2883, 2885.  D.M. was recently separated from his wife.  Admin. Rec. 2882.  Thus, the goal was to increase his functional capacity such that he would be able to live at home with 40 hours of home care a week.  *Id.*

The ALJ found that the record did not demonstrate that the beneficiary required a coordinated, intensive program of multiple services.  Admin. Rec. 137.  She further held that the services could have been provided in a lesser intensive facility.  *Id.*

Dr. Franco noted that "[t]he patient obviously required an intense level of therapy with the physical therapist and occupational therapist to help reduce the contractures and improve his muscle strength and joint range of motion, with the hopes that this would translate into functional improvements to this patient."  Admin. Rec. 2890.  While D.M. was still unable to ambulate at discharge, Dr. Franco felt that he did meet significant short and long term goals and that this was accomplished due to three hours of daily therapy. Admin. Rec. 2890-2891. Dr. Yarowsky, however, disagreed with Dr. Franco's conclusions and stated that D.M. only experienced modest improvement in self-care and mobility.  Admin. Rec. 2863.  He noted that the record did not demonstrate that the intensity of services received was required for this improvement.  *Id.*  Ms. Bogan questioned why, due to his prior level of function and chronic condition, he would need intense, three hour therapy at an IRF.  Admin. Rec. 5279.  Mr. Smith noted that D.M. required an IV push that a SNF could not provide, however this was disputed by Ms. Bogan.  Admin. Rec. 5280; Admin. Rec. 5286-5287.

Ultimately, after a review of the record the Court finds that there was substantial evidence to support the opinion that the rendered services were not reasonable and necessary.

### viii. N.M.

N.M. was a 90 year old male who was admitted to United after hospitalization pneumonia. Admin. Rec. 137.  N.M. suffered from polyarthritis involving his hands and knees with subsequent impairment in joint range of motion, muscle strength and gait function.  Admin. Rec. 2968.  It was

also noted that N.M. suffered from Parkinson's disease type symptoms, contractures to the bilateral knees and had Alzheimer's dementia. Admin. Rec. 3245. N.M. had impaired cognition requiring maximum assistance for comprehension, vocal expression, social interaction and problem solving. Admin. Rec. 3240. Additionally, he was dependent for activities involving memory. *Id.*

The ALJ determined that the record did not demonstrate a reasonable expectation of significant practical improvement due to the beneficiary's mental status, contractures and polyarthritis. Admin. Rec. 138. She held that the services performed could have been provided in a lesser intensive facility. *Id.*

Dr. Franco noted that prior to N.M.'s hospitalization he was able to live in a group home at a maximum assist level with ambulation, mobility and balance and a moderate assist level for daily living, transfers, bowel and bladder management and safety. Admin. Rec. 3248. At the time he entered United, however, he was unable to ambulate or perform transfers and self-care activities. *Id.* Thus, the goal was to return him to his prior functional level such that he could return to the group home. *Id.* In the end, N.M. was unable to ambulate due to the contractures in his lower extremities; however, he was able to make enough improvement such that he could move back to the group home. Admin. Rec. 3247. Dr. Yarowsky found that there was not a need for a rehabilitative physician or for 24-hour specialty nursing. He noted that N.M.'s "[c]hronic medical conditions had been managed adequately in the outpatient setting" and that there is no rationale for requiring hospital-level management. Admin. Rec. 3220. He further stated that "[t]he patient

remained dependent for cognition.  An impaired level of cognition, as with this patient, does not complicate intensive rehabilitation as much as provide a potential barrier to it.  As such it does not justify a need for intensive rehabilitation services but does indicate that other such justification should be even stronger." *Id.*  Ms. Bogan's review of the record indicated that minimal progress was made, verbal instructions were required to stay on task and he was unable concentrate. Admin. Rec. 5289.

After a review of the record, this Court finds that the ALJ did have substantial evidence upon which to base her conclusion that N.M.'s services were not reasonably necessary.

                              *ix.  R.M.*

R.M. was a 50 year old male who has polyarthritis, including arthritis of the knees and hips. Admin. Rec. 3322.  R.M. exhibited decreased motor strength in the lower extremities, decreased ability to stand, and decreased joint range of motion in the knees.  *Id.*  R.M. has a history of diabetes, seizure disorder, COPD, depression and morbid obesity.  Admin. Rec. 3472.  The patient was on continuous oxygen. *Id.*  He was treated in an acute care hospital, transferred to a long-term acute care hospital and subsequently admitted to United for an intensive rehabilitation program. *Id.*

The ALJ found that the record did not demonstrate a reasonable expectation of significant practical improvement.  Admin. Rec. 138.  She held that his mobility was impaired by his weight at 390 pounds - considered morbidly obese - which could not reasonably be expected to decrease

in a short period of time.  *Id.*  Thus, the ALJ concluded that "[i]t is impossible to establish that reasonable practical improvement could be expected at the time of the IRF admission."  *Id.*

The record reflects inconsistencies concerning R.M.'s status prior to his entrance into the acute care hospital.  The History and Physical Examination report and the report of Dr. Yarowsky indicate that the patient had been living in a nursing home, was able to ambulate short distances and perform some self-care activities, but that those abilities had been decreased since his treatment in the acute care facilities.  Admin. Rec. 3320; Admin. Rec. 3453.  In contrast, Dr. Franco and Mr. Hill report that he was living at home prior to his acute hospitalization and that he was completely independent three months prior to his entrance at United.  Admin. Rec. 3472; 3479.  The ALJ found that his prior level of function could not be established based on the evidence in the record.  Admin. Rec. 138.  Ultimately, R.M. was not able to work toward therapeutic goals and was discharged at the same functional level.  Admin. Rec. 3475; Admin. Rec. 5304.  At the time of discharge he was using a motorized wheelchair to get around in the community, utilized a rolling walker and manual wheelchair, and was granted personal care and home health services.  *Id.*  Dr. Franco acknowledged that his morbid obesity makes it difficult for a patient to perform activities of self care and ambulate.  Admin. Rec. 5312.

Based on a review of the medical documentation the record demonstrate that the ALJ was correct in finding that the services were not medically reasonable and necessary and could have been provided in a less intensive facility.

*x.  V.M.*

V.M. was a 79 year old male who suffered a right hip fracture and subsequently underwent surgical intervention.  Admin. Rec. 3811.  He was initially sent to CMR for inpatient rehabilitation; however, he developed acute shortness of breath and was returned to North Oaks Medical Center ("North Oaks") to be treated.  *Id.*  V.M. was then sent to Gulf States Long-Term Acute Care Hospital for seventeen days.  *Id.*  United subsequently admitted V.M. in order to provide intensive services in order to gain functional independence and return home with his family.  Admin. Rec. 3804.  V.M. indicated that he wanted to increase his endurance and did not want to remain dependent on oxygen.  Admin. Rec. 3558.

The ALJ determined that the services provided to V.M. were not medically reasonable and necessary.  Admin. Rec. 139.  She held that "[t]he record did not demonstrate that the beneficiary required a coordinated, intensive program of multiple services."  *Id.*  Moreover, "[t]he services at issue should have been provided in a lesser intensive facility such as an SNF as the beneficiary primarily needed to improve his endurance at this point in his rehabilitation."  *Id.*  Lastly, "[h]e did not require 24-hour availability of a physician."  *Id.*

Dr. Franco asserted that due to V.M.'s limited mobility, requirement of continuous oxygen, COPD and the need to monitor antibiotic treatment he did meet the criteria for the need of close medical supervision during rehabilitation.  Admin. Rec. 3812.  Mr. Hill noted that nursing care aimed at V.M.'s respiratory status was priority.  Admin. Rec. 3805.  Dr. Franco asserted that three

hours of daily therapy was required such that V.M. could be returned to his prior level of independence.  Admin. Rec. 3812.  Ms. Bogan pointed at that V.M. was previously wheelchair bound.  Admin. Rec. 5319-5320.  Dr. Yarowsky stated that all medical issues noted in the chart - post-operative anemia, prevention of blood clots, wound care without complex wound issues, and pain - are routinely managed at lower levels of care.  *Id.*  He further noted that "[p]ost-operative deficits from single joint repair are not inherently complex . . . [and] do not require complex, coordinated, intense rehabilitation services."  *Id.*  Mr. Smith argued that previous, lower levels of therapy had not worked.  Admin. Rec. 5322.

After a review of the medical documents and the opinion testimony of the doctors and Mr. Hill this Court believes that the ALJ had substantial evidence upon which to base her decision.

   *xi.  E.M.*

E.M. was a 92 year old female with a history of polyarthritis involving her hips, knees and shoulders.  Admin. Rec. 3888.  Prior to entering United E.M., resided at a nursing home.  Admin. Rec. 4136.  E.M. had a history of neuropathy, dementia, GERD, atherosclerosis, depression and hypothyroidism.  Admin. Rec. 3888.  Subsequent to a decline in the ability to ambulate and perform self-care activities, E.M. was admitted to United.  *Id.*

The ALJ found that the record did not substantiate that the services were medically reasonable and necessary.  Admin. Rec. 139.  Specifically she held that there was not a reasonable expectation of significant, practical improvement, that the beneficiary did not require a

coordinated, intensive program of multiple services, and did not require the 24-hour availability of a physician. *Id.*

Dr. Franco asserted that E.M.'s illnesses were hindering her functional progress such that she required close medical supervision. Admin. Rec. 4139-4140. Additionally, Dr. Franco stated that they did expect significant improvement in her functional capacity when utilizing a multi-disciplinary and coordinated program of care. Admin. Rec. 4142. Mr. Hill noted that "[h]er cognitive status would present a challenge but was not a barrier to achieving a successful outcome." Admin. Rec. 4136. Dr. Yarowsky, however, concluded that her cognition level provided a barrier to intensive rehabilitation. Admin. Rec. 4112. Additionally, the fact that E.M. was admitted to United from a SNF without development of new and acute medical issues indicates that IRF care is not required. *Id.* Ms. Bogan echoed Dr. Yarowsky's findings noting that her decline had been over a six month period. Admin. Rec. 5332-5333.

This Court finds it significant that the medical records, opinions of the doctors and the holding of the ALJ all echo that E.M. had significant cognitive deficits which would impact her rehabilitation. *See* Admin. Rec. 139, 3888, 4112, 4140, 4142, 4132-4133, 4136. Ultimately, this Court finds that the ALJ had substantial evidence upon which to base her decision that the services provided to E.M. were not medically reasonable and necessary.

*xii. J.N.*

J.N. is a 54 year old woman with a prior history of depression with psychotic episodes versus

schizophrenia.  Admin. Rec. 4214.  J.N. had experienced stroke in 2001 and claimed to have

experienced a stroke approximately one to two weeks prior to her hospitalization at United.[4]  *Id.*

Regardless of whether or not J.N. actually experienced a stroke, she entered United complaining

of an increased difficulty walking and a decreased ability to perform self-care.  *Id.*  She was

admitted to United after refusing to be seen in the hospital.  *Id.*  Other pertinent medical history

includes hypertension and diabetes.  Admin. Rec. 4405.

   Significant to the ALJ was J.N.'s paranoid behavior, refusal of medication, ability to walk in

the halls and shower, ability to eat without assistance, and the attainment of a "therapeutic pass"

to leave the facility on a Saturday.  Admin. Rec. 140.  As a result, the ALJ found that the record did

not demonstrate that the beneficiary required a coordinated, intensive program of multiple

services and that any services provided should have been given in a less intense facility or

psychiatric facility.  *Id.*

   The record reflects that J.N. had previously used a cane at times, walker at other times and

also a wheelchair.  Admin. Rec. 4214.  Prior to entering United she was living with her son with the

assistance of home health care.  Admin. Rec. 4397.  Dr. Franco asserted that because of her stroke

---

4

J.N.'s chief complaint was that she "had a stroke."  Admin. Rec. 4214.  Dr. Romaguera felt that J.N.
had a stroke.  *Id.*  On the other hand, Dr. Donner's analysis of J.N.'s brain MRI indicated that there
is "[p]ossible old ischemic changes involving the left side of the pons.  This is minimal in degree."
Admin. Rec. 4257.  Dr. Franco articulated that while the MRI was negative, this does not necessarily
mean that a stroke did not occur.  Admin. Rec. 5357.  Ultimately, the ALJ found that "an MRI
contained in the record did not reveal any evidence of a stroke."  Admin. Rec. 140.

and subsequent right side paresis coordinated care was required and three hours of intense therapy was needed.  Admin. Rec. 4406.  Dr. Yarowsky stated that inpatient rehabilitation is the standard of care following major stroke.  Admin. Rec. 4378.  On the other hand, "[i]n the absence of complicating issues Medicare coverage turns primarily on the severity of the patient's presentation and the reasonableness of the rehabilitation goals."  *Id.*  The hearing indicated an issue concerning the J.N.'s medical and stroke history.   Admin. Rec. 5345-5346, 5353-5354.  Additionally, the medical records iterated that "[a]chievement of some long term goals was limited by [J.N.]'s inappropriate behavior."  Admin. Rec. 4401.  This was confirmed with the recitations of various psychiatric episodes throughout the medical summaries.[5]  Dr. Yarowsky explained that when a patient acts in this fashion it is contradictory to effective intensive rehabilitation services.

---

[5]

*See* Admin. Rec. 4214 (patient has blurry vision which she attributes to neighbors injecting her with insulin while she is asleep); Admin. Rec. 4405 (during the patient's stay she demonstrated very paranoid behavior with delusional thinking and cursed different staff members and called police with false charges against the staff members; the patient did have psychiatric history and had delusional beliefs involving some staff members); Admin. Rec. 4398 (in addition to other medical conditions the patient was experiencing delusional and psychotic episodes complaining of ringing in the ears, blurred vision and had fluctuation in blood pressure; J.N. exhibited psychiatric symptoms such as verbal threats, refusal to cooperate with laboratory tests and medication administration.  She behaved in a paranoid manner accusing staff of taking her belongings.  She was alert and oriented, but her behavior and emotions were uncooperative, aggressive with paranoid suspicions); Admin. Rec. 4401 (patient demonstrated paranoid like concerns and her perception of circumstances was often not accurate); Admin. Rec. 5344 (neighbors were turning her into the Ku Klux Klan and the police department wouldn't help her and her son because the neighbors were paying them off).

Admin. Rec. 4378.  He noted that this is not just a complication to intensive rehabilitation but a barrier to it.  *Id.*

Based on this Court's review of the medical documentation, summaries and opinions of doctors this Court finds that the ALJ did have substantial evidence upon which to base her decision.

*xiii.  Z.S.*

Z.S. was a 67 year old female who had a history of cerebral palsy, right hemiparesis, dysathria, and arthritis involving hips knees and shoulders.  Admin. Rec. 4701; Admin. Rec. 4482. At the time of her entrance to United she was ambulatory with the use of a walker with standby assistance for short distance.  Admin. Rec. 4694.  Z.S. had experienced an increase in falls and a decline in her ability to ambulate and perform self-care activities over the past six months to one year.  Admin. Rec. 4482.  Thus, she was admitted to United.  *Id.*

The ALJ found that the services Z.S. received were not medically reasonable and necessary. Admin. Rec. 141.  She noted that Z.S. had a urinary tract infection during her stay, however there was not evidence of acute medical issues that required the 24-hour availability of a physician.  *Id.* Moreover, a coordinated, intensive program of multiple services was not needed and that the services could have been provided in a less intense facility.  *Id.*

Dr. Franco asserted that Z.S. needed 24-hour care as she had a urinary tract infection which needed monitoring and medicine changes.  Admin. Rec. 4702.  He further noted that the patient met five out of five long-term occupational therapy goals and four out of four long-term physical

therapy goals.  Admin. Rec. 4703.  He concluded that this progress could not have been made at

a skilled nursing facility or in-home care.  *Id.*  Ms. Bogan asserted that the patient had a long history

of a chronic condition of cerebral palsy and there is a discrepancy as to why the patient needed

inpatient care.  Admin. Rec. 5359-5360.  She further stated that the documentation did not support

the necessity and intensity of inpatient rehabilitation services and that these services could have

been provided at a lower level of care.  Admin. Rec. 5358.  Mr. Smith asserted that an acute

condition is not needed for entrance into an IRF; however, Ms. Bogan disagreed and noted that

United is an acute care facility with acute care benefits.  Admin. Rec. 5360-5361.

Ultimately, this Court finds that the ALJ had substantial evidence to find that Z.S.'s services

were not medically reasonable and necessary.

> *xiv.  M.W.*

M.W. was a 77 year old female who was diagnosed with polyarthritis of multiple weight

bearing joints.  Admin. Rec. 5027.  There is a discrepancy as to whether or not M.W. was post CVA

with left-sided paresis.  Admin. Rec. 5002; Admin. Rec. 5027.  M.W. was admitted to an acute

hospital after a change in mental status and new onset of seizures.  Admin. Rec. 5020.  While at the

acute hospital tests revealed an inoperable malignant tumor of the stigmoid colon.  *Id.*  She was

later admitted to United for rehabilitation services.  Admin. Rec. 141.

The ALJ held that M.W.'s services were not medically reasonable and necessary.  Admin.

Rec. 142.  She found that the record did not substantiate a finding that there was a reasonable

expectation of significant practical improvement, that the beneficiary required a coordinated, intensive program of multiple services or that the 24-hour availability of a physician was needed. *Id.* She noted that the services rendered should have been provided in a less intense facility. *Id.*

Dr. Franco asserted that the patient had multiple medical issues and rehabilitation needs that required her inpatient hospital stay. Admin. Rec. 5027. He noted that the physicians were constantly needed to change medications. Admin. Rec. 5028. He concluded that three hours of therapy a day was needed to return M.W. to her prior functional level as adequate progress had not been made at either the acute hospital or the long term acute hospital. Admin. Rec. 5028-5029. Conversely, Dr. Yarowsky stated that there was not a need for 24-hour physician care or specialty nursing. Admin. Rec. 5001. Ms. Bogan stated that there was confusion as to why M.W. was admitted. Admin. Rec. 5369. Dr. Yarowsky concluded that the patient was not admitted to United with a diagnosis of acute CVA and had not had recent CVA; however, Mr. Smith stated that the nurse liaison's preadmission screen revealed CVA with paresis. Admin. Rec. 5002; Admin. Rec. 5371. Ms. Bogan concluded that while at United M.W. made progress, however she had episodes of confusion and only made progress with maximum encouragement to do tasks. Admin. Rec. 5369.

This Court finds that the ALJ had substantial evidence upon which to base her decision that the services rendered were not medically reasonable or necessary.

D) <u>Conclusion</u>

Ultimately, inpatient rehabilitation services are reasonable and necessary when an individual's physical condition meets **all** of the eight medicare requirements. *Medicare Coverage of Inpatient Hosp. Rehab. Servs*, 50 Fed. Reg. 31040-01 (July 25, 1985) (emphasis added). The ALJ found that each of these beneficiaries did not meet at least one of the eight requirements.

The MAC held that "[t]he appellant has cited to no specific evidence in the record to counter the ALJ's determinations that the fourteen beneficiaries at issue did not require an intensive level of care in an IRF setting." Admin. Rec. 9. The MAC further noted that while United pointed to considerable progress made by the beneficiaries, "[w]hether or not progress was made through rehabilitation is not the determinative factor for finding coverage for IRF services." *Id.* Ultimately, the MAC concurred with the ALJ's assessment of the evidence and affirmed the ALJ's non-coverage findings for the fourteen disputed beneficiaries. *Id.*

This Court finds that the ALJ reasonably interpreted the appropriate provisions, gave adequate credence to the medical opinions before her, and had substantial evidence in the record to support her conclusions. The Court further finds that the Medicare Appeals Council correctly applied the law in affirming the Administrative Law Judge. Ultimately, this Court affirms the decision of the Medicare Appeals Council and summary judgment in favor of HHS on this issue is required.

*III. United's Remaining Issues*

United also argues that the Secretary's decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance of law because: (1) of the improper application of 41 C.F.R. § 412.23;(2) of the inappropriate participation at the ALJ hearing by agency representatives; and (3) the decision failed to offset from the overpayment amounts associated with the denied Medicare Part A ARF admissions any allowable payments under Medicare Par B or for IRF inpatient assessments of patients rehabilitation potential.  (Doc. 20, ¶¶4-6.)  HHS argues that the Court lacks subject matter jurisdiction to hear these arguments.  Specifically, HHS asserts that because United did not raise these issues at lower levels of the appeal process then these issues are not exhausted and this Court lacks jurisdiction.  (Doc. 25.)

"Under ordinary principles of administrative law a reviewing court will not consider arguments that a party failed to raise in timely fashion before an administrative agency."  *Gulf Restoration Network v. Salazar*, 683 F.3d 158, 174-175 (5th Cir. 2012) (quoting *Sims v. Apfel*, 530 U.S. 103, 114-15 (2000)).  The *Sims* court was unanimous in agreeing that "[a]n issue not presented to an administrative decisionmaker cannot be argued for the first time in federal court."  *Sims*, 530 U.S. at 112 (O'Connor, J., concurring in part and concurring in the judgment).  "[C]ourts require administrative issue exhaustion as a general rule because it is usually appropriate under [an agency's practice] for contestants in an adversary proceeding before it to develop fully all issues."  *Id.* at 109 (quoting *United States v. L.A. Tucker Truck Lines, Inc.* 344, U.S. 33, 36-37 (1952)).  Despite this general rule, the *Sims* test requires courts to determine whether a proceeding is  adversarial

or inquisitorial before applying the general rule of issue exhaustion.  *Id.* at 110-112.  "Where the parties are expected to develop the issues in an adversarial proceeding, it seems to us that the rationale for requiring issue exhaustion is at its greatest."  *Id.* at 110.  Conversely, when "an administrative proceeding is not adversarial . . . the reasons for a court to require issue exhaustion are much weaker."  *Id.*

The ALJ determined three issues: (1) whether the provided services were excluded from coverage under Section 1862(a)(1)(A) of the Act; (2) whether the liability of United may be waived pursuant to Section 1879 of the Act; and (3) whether the PSC's assessment of overpayment was based upon a statistically valid sample.  Admin. Rec. 118-119.  In its appeal of the ALJ decision, United requested the MAC to review only the fourteen unfavorable coverage determinations remaining at issue.  Admin. Rec. 15; 18 ("This appeal is part of a statistical sample of 30 claims.  We only want to appeal the decision on 14 of those claims").  Thus, the MAC limited its review of the ALJ's action to the exceptions raised by the party in the request for review pursuant to 42 C.F.R. § 405.1112.  Admin. Rec. 3.

"[T]he requirements of administrative issue exhaustion are largely creatures of statute." *Sims*, 530 U.S. at 107 (citing *Marine Mammal Conservancy, Inc. v. Dep't of Agric.*, 134 F.3d 409, 412 (C.A. D.C. 1998)).  During a Medicare appeal, the ALJ must evaluate the facts and consider the CMS policies.  *Medicare Program: Changes to the Medicare Claims Appeal Procedures*, 70 Fed. Reg. 11420-01, 11458 (Mar. 8, 2005) (to be codified at 42 C.F.R. pts. 401 and 405).  Both the ALJ and the

MAC review the facts of the particular case to determine whether and how the policy in question applies to the specific claim for benefits.  *Id.*  Lastly, appeals under 42 C.F.R. 405 are adversarial when liability under sections 1879 or 1842(l)(1)(C) of the Act is an issue.  *Id.*  "[T]he interests of the provider or supplier and the beneficiary concerning liability are adverse and can be contested during the ALJ hearing."  *Id.*

The Administrative Record before this Court clearly indicates that liability under sections 1879 and 1842(l)(1)(C) were at issue before the Administrative Law Judge.  Thus, the hearing is considered an adversarial proceeding.  United's remaining issues are being argued for the first time before this Court.  Under both the general rule and the *Sims* test this is inappropriate.  Consequently, these issues are not properly before this Court and summary judgment in favor of HHS on these issues is required.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Cross-Motion is GRANTED.  Judgment shall be entered in favor of Defendant, dismissing this action.

New Orleans, Louisiana this 24th day of August, 2012.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT COURT JUDGE**